United States Courts
Southern District of Texas
FILED
AUG 2 0 2026
Nathan Ochsner, Clerk of Court

# IN THE UNITED STATES COURT FOR THE SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION

| | | |
|---|---|---|
| JOSEPH AARON CALDARERA, | § | DAMAGES |
| | § | DECLARATORY JUDGEMENT |
| Plaintiff | § | |
| | § | |
| v. | § | |
| | § | |
| CONSTITUTIONAL SHERIFF'S PEACE OFFICER'S ASSOCIATION, INC; | § | Cause No. 4:26-cv-04110 |
| | § | |
| MONTGOMERY COUNTY | § | |
| | § | |
| WESLEY DOOLITTLE, Sheriff MCSO in his official capacity | § | |
| | § | |
| RICHARD MACK, Chairman CSPOA | § | |
| | § | |
| RAND HENDERSON, former Sheriff In his individual capacitiy; | § | |
| | § | |
| LESLESLY WILLIAMS, Arresting Officer In his official and individual capacities; | § | |
| | § | |
| NATHANIEL INMON, Arresting Officer In his official and individual capacity | § | |
| | § | |
| Defendants | § | |

---

# FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES (42 U.S.C. § 1983, 42 U.S.C. § 1985(3), 1988)

**TO THE HONORABLE COURT:**

NOW COMES Plaintiff, Joseph Aaron Caldarera, appearing pro se, and respectfully alleges and prays as follows.

## I. NATURE OF THE ACTION AND JURY DEMAND

1. Plaintiff demands a trial by jury on all claims so triable.

2. Plaintiff Joseph Caldarera, a certified Texas educator, was the documented victim of a domestic assault by his adult brother on February 3, 2021. Rather than arrest the assailant, Montgomery County Sheriff's Office deputies arrested Plaintiff — notwithstanding his visible facial injuries and his brother's lack of any comparable injury — and separately charged him with injuring their elderly mother despite the absence of any evidence of bodily injury to her. Defendants then transmitted false and exaggerated information about the incident to the Texas Education Agency, resulting in a default judgment suspending Plaintiff's teaching certification. When Plaintiff sought accountability through an internal affairs complaint, Defendant Sheriff Rand Henderson declined to take any action against the arresting officers.

3. Plaintiff brings this action under 42 U.S.C. § 1983 for violations of his rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution, and a supplemental state-law claim for intentional infliction of emotional distress under Texas law.

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction over Plaintiff's state-law claim under 28 U.S.C. § 1367.

5. Venue is proper in the United States District Court for the Southern District of Texas, Houston Division, pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to this action occurred in Montgomery County, Texas, within this district and division.

## III. PARTIES

6. Plaintiff Joseph Caldarera is a certified educator in French and Spanish who resides in Harris County, Texas. Plaintiff resided in Montgomery County at the time of the events giving rise to this dispute.

7. Defendant Montgomery County is sued through Sheriff Wesley Doolittle in his official capacity as the current elected Sheriff of Montgomery County and successor to Defendant Henderson.

8. Defendant Rand Henderson was the elected Sheriff of Montgomery County and the final policymaker for MCSO with respect to law enforcement policy, training, and operational practice at all times relevant to this Complaint. He is sued in his individual capacities and may be served at the registered-agent address for Rand Henderson Consulting LLC, or at his last known address.

9. Defendant Lesley Williams was a Deputy Sheriff for MCSO at all times relevant to this Complaint. He is currently employed as a Jailer by the Harris

County Sheriff's Office. He is sued in his official and individual capacities and may be served at Harris County Sheriff's Office, 1200 Baker St., Houston, TX 77002.

10. Defendant Nathan Inmon was a Deputy Sheriff for MCSO at all times relevant to this Complaint. He is sued in his official and individual capacities and remains employed with MCSO; he may be served at 1 Criminal Justice Drive, Conroe, TX 77301.

11. Defendant Constitutional Sheriff's Peace Officer's Association, Inc. ("CSPOA") is a nonprofit corporation organized under the laws of Arizona. It may be served through its President, Sam Bushman in UT.

12. Defendant Richard Mack is the founder and Chairman of the Board of Directors of CSPOA. He is sued in his individual capacity for conduct establishing minimum contacts with Texas as alleged below, and may be served in AZ.

## IV. DISPOSITION OF THE UNDERLYING CRIMINAL CHARGES

13. The Assault Family Violence charge arising from the February 3, 2021 incident, Cause No. 21-355-441 in Montgomery County Court at Law No. 5 — the charge alleging Plaintiff struck Christian — was dismissed outright on May 23, 2022. Plaintiff entered no plea of any kind to this charge, and no judicial confession, stipulation, or admission of any fact was ever made in connection with it. Additionally, a Violation of Protective Order that arose as a result of confusion as discussed below, 21-355-631 - was also dismissed outright on May 23, 2022.

14. Because Cause No. 21-355-441 was dismissed without any plea, this Complaint's claims arising from Plaintiff's arrest for allegedly striking Christian — including Count I, Part A (as to that arrest), Count II, and Count III, Sub-Theory A (as to that arrest) — are subject to no Heck v. Humphrey exposure of any kind. There is no judicial admission for any finding in Plaintiff's favor on these claims to contradict.

15. The Injury to an Elderly Individual charge, Cause No. 21-02-01843-CR in the 359th District Court of Montgomery County — the charge alleging Plaintiff caused bodily injury to his mother — was not dismissed on that date. It was instead reduced, on the same day, May 23, 2022, by plea agreement to Assault Causing Bodily Injury under Tex. Pen. Code § 22.01, and that reduced charge was resolved by an order of deferred adjudication community supervision under Tex. Code Crim. Proc. art. 42A.101. Plaintiff successfully completed the terms of that supervision, and the reduced charge was dismissed on November 28, 2023, with no final adjudication of guilt entered.

16. As alleged in Section V.C below, May 23, 2022 was also the date on which Plaintiff's then-counsel, Joann Linzer, characterized his self-prepared pro se motions as "meritless" and told him a jury would convict him "with 100% certainty," and the date Plaintiff — after eighteen months of declining the State's plea offers — accepted the reduced plea. The dismissal of one charge and the

pressured reduction and plea on the other therefore occurred on the same day, in the same proceeding.

17. The plea to the reduced Assault Causing Bodily Injury charge did not include a factual judicial confession or stipulation of specific facts; Plaintiff admitted no particular conduct beyond the bare plea itself, and maintained his account of the underlying events throughout the eighteen months preceding it.

18. Plaintiff alleges that the reduced Assault Causing Bodily Injury charge was itself unsupported by any evidence of bodily injury: no cut, bruise, scrape, or other objective indicator of injury to Plaintiff's mother appears anywhere in the record, notwithstanding the change in the charge's label. Plaintiff was the only person in the underlying fact pattern with any documented physical injury — a busted lip and a cut between his eyes, consistent with having been struck twice with a closed fist — corroborating that the account he gave to Defendants Williams and Inmon at the scene matched the physical evidence, while no comparable evidence existed as to either Christian or Plaintiff's mother.

19. Because Cause No. 21-355-441, and 21-355631 resulted in outright dismissal with no plea, and the plea to the reduced charge in Cause No. 21-02-01843-CR included no factual judicial confession, no claim in this Complaint requires a finding inconsistent with any fact Plaintiff has judicially admitted. The doctrine of *Heck v. Humphrey*, 512 U.S. 477 (1994), accordingly poses no bar to any claim pled below. *See DeLeon v. City of Corpus Christi*, 488

F.3d 649 (5th Cir. 2007) (Heck's favorable-termination rule turns on whether a claim would contradict a factual judicial confession made as part of a plea; it has no application where, as here, no such confession was ever entered).

## V. FACTUAL BACKGROUND

### *A. Policy Background: MCSO's Institutional Participation in CSPOA Training and Doctrine*

20. The Constitutional Sheriffs and Peace Officers Association ("CSPOA") is an organization founded in 2011 by Richard Mack, a former sheriff of Graham County, Arizona, and a founding board member of the Oath Keepers. CSPOA's core teaching, disseminated to county sheriffs and law enforcement officers nationwide, including in Texas, is that the county sheriff constitutes the highest lawful authority within a county, superseding the authority of state and federal government, and that a sheriff has both the power and the duty to refuse enforcement of any law, order, or act that the sheriff personally deems unconstitutional.

21. On May 25, 2023, the Texas Commission on Law Enforcement ("TCOLE"), the state agency responsible for licensing and regulating law enforcement training in Texas, issued formal findings and conclusions following a multi-year investigation into CSPOA training events conducted in Texas. TCOLE's investigation included review of audio recordings, documentary evidence, interviews with attendees, and inspection of training-provider files.

22. TCOLE's investigation found that CSPOA training events taught, among other things, that: (a) sheriffs "have a duty to interpose on behalf of constituents" against state and federal officials whose laws, orders, or acts they individually deem unconstitutional; (b) "unjust laws" are "nullities" and unlawful to enforce; (c) a peace officer who refuses to follow a law or order deemed unconstitutional is "upholding the law"; and (d) attendees should not rely upon their own duly elected county attorneys.

23. TCOLE's investigation concluded that this material lacked legal authority to support its central claims, misapplied the doctrine of judicial review established in Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803), and was properly categorized as political discourse rather than lawful instruction on the duties of Texas peace officers. TCOLE further concluded that CSPOA content would not merit law enforcement training credit in Texas going forward.

24. Prior to TCOLE's 2023 findings, TCOLE field agents had, in 2021, monitored and awarded training credit for CSPOA-affiliated events in Texas, including events at which Richard Mack personally presented, without objection or further inquiry, reflecting the extent to which CSPOA's doctrine had been disseminated to and credentialed among Texas law enforcement, including sheriffs' offices, prior to any formal repudiation of that content.

***MCSO's Institutional Co-Sponsorship of CSPOA Training***

25. In late February 2021, CSPOA held a two-day training event titled "The County Sheriff: America's Last Hope" in The Woodlands, Texas, within Montgomery County, cohosted by CSPOA and MCSO.

26. At the February 2021 Woodlands event, speaker KrisAnne Hall, a frequent collaborator of Richard Mack, told law enforcement attendees that state and county laws are superior to federal law, that the county sheriff is the most powerful elected official in the country, and that it is a sheriff's duty to ignore federal gun laws.

27. Similar CSPOA training events promoting the same doctrine, and featuring Richard Mack and other CSPOA-affiliated speakers, were also cohosted by other Texas sheriffs' offices, including the Burnet County Sheriff's Office (July 2021) and the Houston County Sheriff's Office (July 2021), reflecting a broader pattern of Texas sheriffs' offices, including MCSO, institutionally sponsoring and lending official credibility to CSPOA's doctrine.

***Defendant Henderson's Personal Endorsement and Public Commitment to CSPOA Doctrine***

28. Rand Henderson served as Montgomery County Sheriff from January 1, 2017, and at all times relevant to this Complaint was the final policymaker for MCSO with respect to law enforcement policy, training, and operational practice within Montgomery County, Texas.

29. In a 2016 candidate questionnaire published prior to his election, then-candidate Henderson stated that Richard Mack "not only endorses my campaign for Sheriff, but he is also my friend," and that Henderson "would utilize him as an expert advisor and resource in combating any federal overreach situation faced by Montgomery County."

30. In the same questionnaire, Henderson stated: "The 10th amendment is often trampled on by the Federal Government... A local official such as the Sheriff is immune from being compelled to carry out Federal executive orders," and further pledged that if the federal government sought local law enforcement assistance in "an unconstitutional act such as the unwarranted seizure of firearms, then I would not assist nor would I stand for this act to occur in our community," and that he would "use the power of my office to stop an unconstitutional encroachment by the federal government."

31. Henderson's 2016 statements were made and published prior to his assumption of office and prior to the events giving rise to the claims alleged elsewhere in this Complaint, and reflect his pre-implementation adoption of the doctrine that MCSO institutionally promoted through its co-hosting of the February 2021 CSPOA event described above.

***Defendant Mack's Public Statements at the February 2021 Woodlands Event***

32. In its findings, TCOLE identified the following statements attributed to Defendant Mack at the February 2021 Woodlands training event, relevant to the conspiracy alleged in Count VII below:

a. "This is a war" in which local, state, and federal agencies have been "weaponized against you";

b. State and federal bureaucrats have "infiltrated" and "placed traitors and saboteurs in local authority";

c. These agents "attack by using federal and state agencies to tyrannize people to advance goals";

d. Sheriffs "have a duty to interpose on behalf of constituents" against "state and federal bureaucrats" and other "state agents" whose laws, orders, or acts they individually deem unconstitutional;

e. "Any government" involved in tyranny should be stopped — and when a peace officer refuses an order or law they deem unconstitutional, "they are upholding the law";

f. State executive orders are not law and "can't be enforced" because "you don't swear allegiance to the governor";

g. Some acts of the legislature "are not laws" but instead "pretended legislation" — and law enforcement officers are "empowered to say what the law is";

h. "Unjust laws" are not to be followed because they are "nullities" and are unlawful to enforce;

i. Attendees are urged to not rely upon duly elected Texas County Attorneys, who are statutorily charged with protecting the legal interests of their counties; and

j. Practicing attorneys — trained in "the case law method" — "don't know what the law is" and mistake "pretended legislation" for real law.

33. TCOLE's own findings connect this material to the following authority: Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803) (judicial review, not individual officer judgment, is the constitutionally assigned mechanism for determining a law's validity); Patel v. Tex. Dep't of Licensing & Regulation, 469 S.W.3d 69, 87 (Tex. 2015) (determining whether a law is unconstitutional is a question of law for courts); United States v. City of Jackson, Miss., 318 F.2d 1, 17 (5th Cir. 1963) (describing the interposition theory as political theory in defiance of the rule of law); and Nw. Austin Mun. Util. Dist. No. One v. Holder, 557 U.S. 193, 205 (2009) (constitutionality determinations are among the "gravest and most delicate" duties courts perform, not individual officers or lawyers).

34. These statements, and MCSO's institutional participation in disseminating them, are alleged both as the Monell policy foundation for Count IV below and as evidence of the agreement and shared objective underlying the conspiracy alleged in Count VII below.

***Defendant Henderson's February 27, 2021 Public Remarks***

35. At the same February 2021 Woodlands event, and under the imprimatur of CSPOA, Defendant Henderson himself told attendees that MCSO operated as a "second amendment sanctuary," and described what he called the "Rosa Parks effect": using an alternative, facially neutral charge to reach an underlying characteristic rather than charging that characteristic directly, stating in substance that pursuing an arrest through "subterfuge" — a different charge to reach the same target — is "just a different way of carrying out the same threat." He further stated, "Thank God we've got someone like Sheriff Mack that's helping us."

36. As MCSO's final policymaker for law enforcement matters, Defendant Henderson's public description of this practice, and MCSO's institutional co-hosting of the event at which he made it, are alleged as the operative policy, practice, or custom giving rise to municipal liability under Count IV below, and as further evidence of the agreement underlying Count VII.

***B. The February 3, 2021 Incident***

37. On February 3, 2021, MCSO responded to a domestic violence alteration where Plaintiff reported that his adult brother, Christian Caldarera ("Christian"), who is six years older than Plaintiff, was assaulting him.

38. As he was calling, Christian struck him in the face, and then struck him four additional times in an effort to stop him from completing the call. The punches caused a cut to Plaintiff's lip and a cut between his eyes - noted and confirmed by Defendants Inmon and Williams as truthful.

39. Plaintiff fled from Christian. Christian pursued him. In order to create distance from Christian and complete his call to police, Plaintiff threw nearby objects — including a spatula and an iron scent holder — in Christian's direction, and, in the course of the same defensive flight, a bundle of thorns that struck his mother.

40. This conduct was legally justified self-defense under Tex. Pen. Code § 9.31, which permits the use of force, to the degree reasonably believed necessary, to protect against another's use or attempted use of unlawful force. Plaintiff was, throughout this sequence, attempting to escape an ongoing, unprovoked physical assault and to complete an emergency call for police assistance — not engaging in any aggressive or unprovoked act.

41. Christian told Defendants Williams and Inmon that Plaintiff had "escalated into violence," but Christian had no visible facial injury. No reasonable officer could have ever determined that Christian was hit with 2 closed fist punches.

42. Defendant Williams's police report documented Plaintiff's facial injuries — a busted lip and a cut between the eyes — consistent with the kind of visible injury that *Arzaga v. State*, 86 S.W.3d 767, 778–79 (Tex. App.—El Paso 2002, no

pet.), holds is legally sufficient evidence from which a fact-finder may infer bodily injury. The same report documents no comparable facial injury to Christian.[1]

43. Notwithstanding this documented, one-sided physical evidence, and notwithstanding that Plaintiff was the person who summoned police to report an assault against himself, Defendants Williams and Inmon arrested Plaintiff — not Christian — for assault causing bodily injury under Tex. Pen. Code § 22.01 - by "two unwanted closed-fist punches to the face" where there was no injury to Christian's head. Defendants were sentiently aware of failure of probable cause.

44. Defendant Williams's report also stated that Christian "hates gay people" and is "homophobic," language with no investigative purpose other than to characterize Plaintiff by reference to a protected characteristic in the course of an arrest lacking probable cause.

45. The same day, Plaintiff was separately charged with Injury to an Elderly Individual under Tex. Pen. Code § 22.04, based on the thorns that struck his mother in the course of the defensive flight described above. Defendant Williams's report identifies no cut, bruise, scrape, or other objective indicator of injury to Plaintiff's mother — falling short of even the permissive evidentiary threshold Arzaga applies

[1]Arzaga v. State, 86 S.W.3d 767, 778–79 (Tex. App.—El Paso 2002, no pet.) (jury could reasonably infer that a domestic-assault complainant suffered pain — and therefore bodily injury under Tex. Pen. Code § 1.07(a)(8) — from photographs showing a cut, bruise, and swelling to her mouth, together with testimony that the injury was consistent with a closed-fist blow, even though no witness testified directly that she felt pain).

to inferring bodily injury from indirect evidence, let alone the probable-cause standard required to arrest.

46. Of the three people present for the altercation between Plaintiff and Christian — Plaintiff, Christian, and, as to the separate allegation, Plaintiff's mother — Plaintiff was the only one with any documented physical injury. The account Plaintiff gave to Defendants Williams and Inmon at the scene was consistent with, and corroborated by, that documented injury and, upon information and belief, by the 911 call itself.[2]

47. Plaintiff alleges, upon information and belief, that this evidence — including pictures taken at the scene of Joseph's busted lip and busted eye, which would independently corroborate that Christian, not Plaintiff, was the aggressor — is why the State ultimately dismissed Cause No. 21-355-441 outright, described in Section IV above, rather than pursue it.

48. Christian is also a certified Texas educator. Because both Plaintiff and Christian held Texas educator certificates, correctly identifying which of them struck the other with a closed fist bore not only on Plaintiff's own criminal and professional exposure, but on whether any comparable scrutiny of Christian's fitness to instruct would ever arise. Defendants Williams and Inmon's misidentification of Plaintiff as the aggressor foreclosed that inquiry entirely: the

---

[2] 2 Arzaga v. State, 86 S.W.3d 767, 778 (Tex. App.—El Paso 2002, no pet.) (existence of a cut, bruise, or scrape is sufficient — though not the exclusive — evidence of the physical pain necessary to establish bodily injury).

person Plaintiff alleges actually struck him has faced no professional consequence of any kind, while Plaintiff's career was effectively ended by a proceeding resting on the opposite factual premise. Ultimately, Defendants' dishonest judgment would endanger children and shows callous indifference for integrity of the judiciary and the public education K-12 system.

***The Denial of Shoes***

49. Defendant Williams's police report itself noted that Plaintiff was without shoes at the time of his arrest. At that time, Plaintiff asked Defendants Williams and Inmon to allow him to obtain shoes. Defendants Williams and Inmon refused this request. As a direct result of this single refusal, Plaintiff remained without shoes at the time of his first release from custody following the February 3, 2021 arrest.

50. Plaintiff was released on PR bond on February 5, 2021. Lacking shoes, Plaintiff took a taxi to his residence following this first release.

***The Protective Order and Second Arrest***

51. Following the February 3, 2021 arrest, a court issued a protective order prohibiting Plaintiff from contacting his mother and from entering her residence, as a condition of his bond. This is plaintiffs home too where he was caretaker for his elderly mother and father for 5 years prior. Christian was visiting from Alaska.

52. On February 5, 2021, Plaintiff went to that residence, among other reasons, to attempt to obtain shoes and other personal belongings after making an arrangement involving third party communication whereby the MCSO jail receptionist called his mother and arranged for Caldarera's belongings to be placed outside the house.

53. As he approached, Christian called MCSO to report Plaintiff's presence at the residence. MCSO responded and arrested Plaintiff a second time, for violation of the protective order, before Plaintiff had any opportunity to obtain shoes from the residence.

54. This second arrest resulted in dismissal of the charge on May 23, 2021.

55. Because this charge resulted in dismissal rather than any plea, deferred adjudication, or conviction, no aspect of *Heck v. Humphrey,* 512 U.S. 477 (1994), or *DeLeon v. City of Corpus Christi,* 488 F.3d 649 (5th Cir. 2007), applies to any claim arising from this arrest.

***The 105-Day Detention***

56. Following this second arrest, Plaintiff was incarcerated for approximately 105 days. During that period, MCSO did not provide Plaintiff his prescribed asthma and HIV medications, notwithstanding his repeated requests.

***Plaintiff's Second Release on May 10, 2021***

57. Plaintiff was never provided shoes, or any opportunity to obtain them, at any point during the intervening approximately 105-day detention described above. As a result, upon his release following that detention, Plaintiff remained without shoes — the direct and uncorrected consequence of Defendants Williams and Inmon's original refusal at the time of arrest. Because the protective order remained in effect, Plaintiff again had no residence he was permitted to enter. Lacking shoes and lacking any residence he could lawfully return to, Plaintiff was compelled to walk barefoot to a Salvation Army shelter, cutting his feet on the road in the course of that walk (approximately 2 miles down First Street in Conroe, TX).

58. Plaintiff alleges that Defendants Williams and Inmon had no security, safety, or operational justification for their original refusal to allow Plaintiff to obtain shoes, and that MCSO had repeated, continuing opportunities — including at intake, during the 105-day detention, and immediately before each release — to remedy this deprivation and did not do so, resulting in Plaintiff going barefoot through both custodial releases and suffering physical injury as a foreseeable consequence. Bodily injury being the measure of security and danger, Christian was the one who caused the busted lip and busted eye. Joseph had only remarked that "Christian had not had sex in 20 years" - protected speech for which the County used as the basis for its assault charge against Joseph.

***C. Pattern of Continuing Abuse: Course of Conduct in the Underlying Criminal Proceedings***

*The following paragraphs describe the conduct of Plaintiff's successive court-appointed criminal defense counsel. Plaintiff does not name these individuals as defendants in this action and does not allege that they were themselves state actors. This conduct is alleged as part of the continuous course of events relevant to the pattern, delay, and cumulative distress underlying Count VI (intentional infliction of emotional distress) and as context for the conspiracy alleged in Count VII, to the extent Plaintiff can develop specific facts showing an actual agreement between any of these individuals and a state-actor Defendant, as opposed to conduct that merely coincided with the State's interests.*

59. On February 9, 2021, Plaintiff's first court-appointed counsel, Charles Crowl, filed a request for notice of the State's intent to introduce character evidence. The State responded with allegations that Plaintiff had used drugs and alcohol, notwithstanding that the police report itself stated alcohol and drugs played no role in the incident. Crowl did not move to exclude this evidence.

60. On March 22 and March 29, 2021, Plaintiff appeared in court to place on the record his refusal of the State's plea offers.

61. On April 29, 2021, Crowl told Plaintiff he would face indefinite detention and additional charges if he did not accept a plea, and that "Montgomery County does not do speedy trials." Plaintiff signed a plea document, noting "under duress" at the signature line; the presiding judge voided that agreement as unconscionable. On May 27, 2021, after Plaintiff continued to insist on motion practice or trial, Crowl withdrew, citing an "ethical conflict."

62. Plaintiff was without appointed counsel from approximately June through August 2021.

63. On August 6, 2021, the court appointed Kristen Brown. During a subsequent conference, Brown acknowledged that Christian struck Plaintiff first, but characterized Plaintiff as having "instigated" the altercation through his remark. Brown did not move for a speedy trial or place the case on the docket.

64. On October 1, 2021, Brown told Plaintiff by text message that she had submitted a request to reset an October 4, 2021 court date; she had not done so. On October 4, 2021, Plaintiff's bond company alerted him that he was still on the docket for that date; Plaintiff appeared as required. On October 7, 2021, Brown withdrew, again citing an "ethical conflict."

65. Plaintiff was again without appointed counsel between approximately October and November 2021.

66. On November 30, 2021, the court appointed Joann Linzer. Linzer made first substantive contact with Plaintiff on February 22, 2022.

67. On April 29, 2022, Linzer represented to the presiding judge that she had conferred ex parte with a different judge, who had found no constitutional violations in the case. At a subsequent hearing on May 23, 2022, that other judge stated she had no recollection of any such conference and that it was the first time she was hearing about the matter.

68. At the May 23, 2022 hearing, Linzer characterized Plaintiff's self-prepared pro se motions as "meritless" and told him a Montgomery County jury

would convict him "with 100% certainty." Plaintiff, after approximately eighteen months of declining the State's plea offers, accepted a plea shortly thereafter.

69. Plaintiff alleges that this cumulative course of conduct — successive withdrawals, unexplained gaps in representation, a fabricated ex parte representation to the court, and pressure to abandon a defense Plaintiff had maintained for eighteen months — forms part of the continuous pattern of abuse underlying Count VI, and that Plaintiff will seek leave to amend to add any of these individuals as defendants if and when facts showing an actual agreement with a state-actor Defendant, rather than parallel conduct, are developed.

***Withheld Exculpatory Photographs***

70. Photographs of Plaintiff's injuries — the busted lip and cut between the eyes described in Section V.B above — were, on information and belief, taken at the scene of the February 3, 2021 incident, consistent with standard evidence-gathering practice for a domestic-violence call. These photographs were exculpatory: they corroborated that Plaintiff, not Christian, had been struck, directly undermining the narrative used to charge Plaintiff with assaulting Christian.

71. These photographs were never disclosed to Plaintiff, made part of the record, or introduced at any stage of the proceedings against him, notwithstanding that they were plainly relevant to his defense across the eighteen months described above during which he faced prosecution. Plaintiff does not allege a freestanding

claim for suppression of evidence under *Brady v. Maryland,* 373 U.S. 83 (1963), because neither underlying charge proceeded to trial. See *Cole v. Carson*, No. 14-10228 (5th Cir. Sept. 25, 2015) (Brady is not implicated where the underlying charge is resolved without trial). Instead, Plaintiff alleges that the existence of these photographs, withheld throughout the pendency of the proceedings against him, is further evidence that Defendants Williams and Inmon's charging narrative was a deliberate fabrication rather than a good-faith mistake, as alleged in Count V, Part C below, and further evidence of the continuous pattern of abuse underlying Count VI.

***D. The Texas Education Agency Proceedings***

72. Defendants Williams and Inmon's report and related statements caused the institution of disciplinary proceedings against Plaintiff's professional teaching certification before the Texas Education Agency ("TEA").

73. On April 11, 2023, TEA staff filed a Request for Issuance of Default Judgment, asserting that Plaintiff had failed to file a timely written answer to the agency's Original Petition and asking the State Board for Educator Certification to deem the Petition's factual allegations admitted and to enter a default judgment sanctioning Plaintiff's certification, up to and including permanent revocation.

74. TEA mailed its Original Petition via certified mail to two addresses on file for Plaintiff on February 7, 2023. Both certified mailings were returned to TEA undelivered. TEA relied on a presumption under 19 Tex. Admin. Code § 249.26(c)

that Plaintiff received the Petition no later than five days after mailing, notwithstanding that neither certified mailing was ever actually delivered to him due to housing instability caused by the Defendants wrongful conduct.

75. TEA's petition alleged, among other things, that Plaintiff "caused injury to his elderly, wheelchair-bound mother by aggressively pulling a food bowl from her and throwing a bundle of thorns at his mother's back causing her pain," and that Plaintiff "caused bodily injury to his brother by hitting him with his hand, a spatula, and an iron scent holder causing cuts, scrapes, and injury." Neither allegation discloses that Plaintiff was, at the time, fleeing an ongoing assault by Christian and attempting to complete a 911 call for police assistance, as alleged in Section V.B above.

76. TEA's petition further alleged that Plaintiff has "a pattern of violent behavior," "the inability to follow court orders," and "lacks the fitness to perform the duties and discharge the responsibilities of an educator," and recommended sanctions up to and including permanent revocation of Plaintiff's certification on that basis.

77. TEA's own petition acknowledges that Plaintiff was never convicted of any offense, stating: "Even though Respondent was not convicted, Respondent's certification is still subject to suspension or revocation because Respondent pled guilty, and the judge deferred further proceedings without entering an adjudication of guilt."

78. The only charge to which Plaintiff ever pled was the reduced Assault Causing Bodily Injury charge described in Section IV above, arising from the allegation regarding his mother — not the allegation regarding Christian. Cause No. 21-355-441, the charge arising from the allegation that Plaintiff struck Christian, was dismissed outright with no plea of any kind, as described in Section IV above. TEA's petition nonetheless treated the unproven allegation underlying that dismissed charge as established fact, by virtue of Plaintiff's default rather than any evidentiary determination.

79. On July 21, 2023, the State Board for Educator Certification entered default judgment against Plaintiff's certification.

80. Since 1925, Texas courts have recognized that TEA/SBEC certificate discipline for "unworthiness to instruct" is an administrative determination independent of, and not coextensive with, the disposition of any related criminal proceeding. *Marrs v. Matthews,* 270 S.W. 586, 588 (Tex. Civ. App.—Texarkana 1925, writ ref'd) (legislature's purpose in authorizing revocation for "unworthiness" was to exclude educators found morally unfit, applied independent of any specific criminal conviction); see also *Gomez v. Tex. Educ. Agency*, No. 03-09-00507-CV (Tex. App.—Austin 2011) (Board need not identify an underlying criminal conviction to sustain an "unworthy to instruct" finding).

***E. Defendant Henderson's Refusal to Prosecute***

81. On November 1, 2023, Plaintiff filed a police report with MCSO internal affairs, seeking to press charges against Defendants Williams and Inmon for official oppression under Tex. Pen. Code § 39.03(d) based on their transmission of false information to the TEA.

82. On May 23, 2024, Plaintiff received a letter from MCSO, signed on behalf of Defendant Henderson, stating that no further action would be taken against Defendants Williams and Inmon.

## CAUSES OF ACTION

### COUNT I — FOURTH AMENDMENT: UNREASONABLE SEIZURE (FALSE ARREST)

83. These allegations are made against Defendants Williams and Inmon, individually; and against Defendant Doolittle, in his official capacity as Henderson's successor.

84. Plaintiff incorporates by reference all preceding paragraphs of this Complaint.

***Part A — The February 3, 2021 Arrests***

85. Defendants Williams and Inmon lacked probable cause to arrest Plaintiff for assault causing bodily injury under Tex. Pen. Code § 22.01, where the documented physical evidence — Plaintiff's facial injuries and Christian's absence of any — pointed to Christian, not Plaintiff, as the person who caused bodily injury, consistent with the standard for inferring bodily injury described in Arzaga v. State, 86 S.W.3d 767, 778–79 (Tex. App.—El Paso 2002, no pet.). This charge,

Cause No. 21-355-441, was dismissed outright with no plea of any kind, and this claim is accordingly subject to no *Heck v. Humphrey* exposure whatsoever, for the reasons stated in Section IV above.

86. Defendants Williams and Inmon likewise lacked probable cause to arrest Plaintiff for Injury to an Elderly Individual under Tex. Pen. Code § 22.04, where no objective evidence of bodily injury to Plaintiff's mother existed. That charge, Cause No. 21-02-01843-CR, was reduced by plea to Assault Causing Bodily Injury and resolved by deferred adjudication later dismissed, as described in Section IV above; because that plea included no factual judicial confession, this claim likewise presents no finding for *Heck v. Humphrey*, 512 U.S. 477 (1994), or *DeLeon v. City of Corpus Christi,* 488 F.3d 649 (5th Cir. 2007), to bar.

***Part B — The Protective-Order Arrest***

87. The protective order excluding Plaintiff from his own residence, described in Section V.B above, was procured based on information from Defendants Williams and/or Inmon identifying Plaintiff, rather than Christian, as the assailant. Plaintiff's subsequent arrest for violating that order was therefore the direct and foreseeable product of the same false information underlying Part A above.

88. This arrest resulted in dismissal of the charge, with no plea, deferred adjudication, or conviction of any kind. Heck v. Humphrey accordingly presents no bar whatsoever to this Part, independent of the analysis required for Part A.

89. As a direct and proximate result of Defendants' unreasonable seizures of his person described in Parts A and B, Plaintiff suffered loss of liberty, exclusion from his own home, emotional distress, loss of professional licensure, and loss of earning capacity, entitling him to actual, compensatory, and exemplary damages under 42 U.S.C. §§ 1983 and 1988.

## COUNT II — FIRST AMENDMENT: RETALIATORY ARREST

90. These allegations are made Against Defendant Williams and Inmon, individually.

91. Plaintiff incorporates by reference all preceding paragraphs of this Complaint.

92. The remark Plaintiff made to Christian immediately before Christian struck him was protected speech under the First Amendment. ("You have not had sex in 20 years.")

93. Defendant Williams arrested Plaintiff, at least in part, because of that protected speech, in the absence of probable cause supporting the charge as actually brought. See Nieves v. Bartlett, 587 U.S. 391 (2019) (retaliatory-arrest claim may proceed notwithstanding the existence of probable cause where the plaintiff presents objective evidence that he was arrested when similarly situated individuals not engaged in the same protected speech would not have been; no such probable cause existed here in any event).

94. As a direct and proximate result of this retaliatory arrest, Plaintiff suffered the injuries described in Count I above, entitling him to actual, compensatory, and exemplary damages under 42 U.S.C. §§ 1983 and 1988.

## COUNT III — FOURTEENTH AMENDMENT: EQUAL PROTECTION (SELECTIVE ENFORCEMENT AND SELECTIVE NON-ENFORCEMENT)

95. These allegations are made against Defendants Williams and Inmon, individually, as to Practice A (prxtextual arrest); against Defendant Henderson, individually, and against Defendant Doolittle, in his official capacity as Henderson's successor, as to Practice B (refusal to enforce existing law).

96. Plaintiff incorporates by reference all preceding paragraphs of this Complaint.

***Practice A — The 2021 Pretextual Arrest***

97. Defendants Williams and Inmon arrested Plaintiff, rather than Christian, pursuant to a practice — publicly described by Defendant Henderson as the use of "subterfuge" — of pursuing a facially neutral charge to reach an impermissible, status-based end, referencing Plaintiff's brother's stated views regarding sexual orientation in the course of the arrest.

98. Plaintiff alleges that his sexual orientation, as referenced in Defendant Williams's own report, was not merely a contextual detail but a but-for cause of the decision to arrest Plaintiff rather than Christian: absent that consideration, the

documented physical evidence — Plaintiff's injuries and Christian's lack of any — would have pointed the investigation toward Christian as the person to be arrested and charged.

99. The false information Defendants Williams and/or Inmon provided identifying Plaintiff as the assailant caused a protective order to be issued excluding Plaintiff, rather than Christian, from Plaintiff's own residence, and caused Plaintiff's second arrest for violating that order, described in Section V.B above and Count I, Part B. That Defendants' misidentification of the victim as the aggressor was not confined to a single charging decision, but repeated itself through a second, independent arrest arising from the same false premise, is further evidence of the pattern alleged in this Sub-Theory.

100. This practice is subject to the same accrual analysis, and the same Heck consideration, as Count I, Part A. The protective-order arrest described immediately above is not subject to any Heck consideration, for the reasons stated in Count I, Part B.

101. Defendants' selective enforcement, described throughout this Sub-Theory, was arbitrary and capricious: it bore no rational relationship to the physical evidence available to Defendants, and its random and unpredictable application — protecting the person who caused documented injury while arresting the person who suffered it — is itself a hallmark of the kind of irrational, standardless government action the Equal Protection Clause forecloses.

***Practice B — The 2024 Refusal to Prosecute and enforce Official Oppression statute ("nullification")***

102. Defendant Henderson's May 23, 2024 decision to decline any action against Defendants Williams and Inmon, notwithstanding MCSO's own knowledge of the underlying conduct, constitutes selective non-enforcement of Tex. Pen. Code § 39.03(d) motivated by an impermissible purpose, or in the alternative, disparate treatment of Plaintiff's complaint as compared to similarly situated complainants, without a rational basis.

103. This claim accrued on May 23, 2024, and this action, filed May 22, 2026, is timely as to this nullification practice without reliance on any tolling or continuing-tort doctrine.

104. This refusal was likewise arbitrary and capricious: MCSO's own internal affairs unit possessed the information necessary to act, and Defendant Henderson's decision not to do so was random and unpredictable in the sense that it followed no articulated, rational standard — the hallmark of an equal-protection violation independent of any single protected characteristic.

105. As a direct and proximate result of the conduct described in both sub-theories, Plaintiff suffered the injuries described throughout this Complaint, entitling him to actual, compensatory, and exemplary damages under 42 U.S.C. §§ 1983 and 1988.

**COUNT IV — MONELL MUNICIPAL LIABILITY (42 U.S.C. § 1983)**

106. These allegations are made against Defendant Doolittle, in his official capacity as Henderson's successor, and Montgomery County.

107. Plaintiff incorporates by reference all preceding paragraphs of this Complaint.

108. To establish municipal liability, Plaintiff must identify (1) an official policy, practice, or custom; (2) a policymaker with actual or constructive knowledge of it; and (3) a constitutional violation whose moving force is that policy, practice, or custom. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Valle v. City of Houston*, 613 F.3d 536, 541–42 (5th Cir. 2010).

***A. Policy of Selective, Pretextual Enforcement ("Subterfuge")***

109. As Montgomery County's independently elected final policymaker for law enforcement, Defendant Henderson's public description and MCSO's institutional co-hosting of the practice described in Section V.A above — using a facially neutral charge as "subterfuge" to reach an impermissible end — constitutes official municipal policy within the meaning of *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986), independent of any need to separately show a widespread practice.

110. This policy was the moving force behind the violation alleged in Count III, Practice A, in that Defendants Williams and Inmon's arrest of Plaintiff rather than Christian is a direct application of the practice Defendant Henderson himself described.

111. Plaintiff's status as a certified Texas educator is alleged as evidence of motive supporting this Count, not as an independent protected classification: because a certified educator is uniquely exposed to collateral discipline before the TEA arising from a criminal charge or arrest, the "subterfuge" practice Defendant Henderson described was particularly effective, and particularly consequential, when deployed against an arrestee in Plaintiff's specific professional position — providing Defendants an additional, non-legitimate reason to pursue a facially neutral charge against Plaintiff rather than Christian.

***B. Policy of Nullification — Denial of Statutory Protection***

112. Independently, Defendant Henderson and MCSO adopted, through the institutional conduct described in Section V.A above, the CSPOA's "nullification" and "interposition" doctrine — under which sheriffs and their personnel treat the enforcement of laws they, or the doctrine they have embraced, deem personally or institutionally inconvenient as optional, notwithstanding the protective purpose those laws serve for the public and for individual complainants. TCOLE's findings specifically identified this doctrine as teaching that "unjust laws" are "nullities" unlawful to enforce, and that sheriffs have "a duty to interpose" against enforcement they personally deem inconsistent with their own view of the law, as described in Section V.A above.

113. This nullification policy was applied to deny Plaintiff the protection of the law on at least two separate occasions. First, Defendants Williams and Inmon

declined to enforce Tex. Pen. Code § 22.01 against Christian, notwithstanding the one-sided physical evidence, pictures taken at the scene, Christian's well-documented arrest record of domestic violence, and Plaintiff's account, described in Section V.B above — the statute that would have protected Plaintiff, and held Christian accountable, as the actual victim of the underlying family assault. Second, Defendant Henderson declined to enforce Tex. Pen. Code § 39.03(d) — Official Oppression — against Defendants Williams and Inmon, notwithstanding MCSO's own internal affairs unit's knowledge of their conduct, described in Section V.E above, denying Plaintiff the statutory protection that provision was enacted to afford him.[3]

114. Each of these refusals to enforce a law that would have protected Plaintiff is, in substance, nullification: a decision by MCSO personnel, consistent with the institutional policy described in Section V.A above, to treat enforcement of laws designed to protect Plaintiff as discretionary rather than obligatory, defeating the rights those laws were enacted to secure. This nullification policy, adopted and ratified by Defendant Henderson as MCSO's final policymaker, was an independent moving force behind the violations alleged in Counts I, III, and V above, and constitutes a separate and independent basis for municipal liability from the policy described in Part A above.

[3] Tex. Pen. Code 39.03(d) was enacted in 2019 by the Texas legislature upon concern by the Texas Education Agency that approximately 17,000 teachers certifications have been impacted by this practice of transmitting false information tot he TEA It is a felony statute.

115. A policy under which enforcement of protective laws turns not on the evidence but on whether enforcement personally or institutionally suits the officer or agency is, by definition, arbitrary and capricious: it makes the protection of the law random and unpredictable rather than a matter of right, contrary to the basic guarantee of reasoned, rational governance the Fourteenth Amendment secures. *County of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998).

116. Defendant Henderson's May 23, 2024 refusal to prosecute or refer Defendants Williams and Inmon for prosecution, notwithstanding MCSO's own internal affairs unit's knowledge of the underlying conduct, is an independent and direct exercise of Defendant Henderson's final policymaking authority, and constitutes an application both of the policy described in Part A above and the nullification policy described in this Part B, giving rise to municipal liability for the violation alleged in Count III, Sub-Theory B.

117. As a direct and proximate result of these policies, Plaintiff suffered the injuries alleged throughout this Complaint, for which Defendant Doolittle, in his official capacity as Henderson's successor, and Montgomery County, are liable under 42 U.S.C. § 1983.

## COUNT V — FOURTEENTH AMENDMENT: PROCEDURAL DUE PROCESS

118. These allegations are made against Defendants Williams, Inmon, and Henderson, individually; and against Defendant Doolittle, in his official capacity as Henderson's successor, as applicable.

119. Plaintiff incorporates by reference all preceding paragraphs of this Complaint.

***Part A — Stigma-Plus (Loss of Professional Licensure)***

120. Government employees and licensees possess a constitutionally protected liberty interest in their professional reputation. *Doe v. U.S. Dep't of Justice,* 753 F.2d 1092, 1104 (D.C. Cir. 1985).

121. Defendants Williams and Inmon's report, and the information conveyed to TEA arising from it, omitted that Plaintiff was fleeing an ongoing, unprovoked assault by Christian and attempting to complete a 911 call for police assistance at the time of the conduct TEA's petition characterized as Plaintiff "hitting his brother" with a spatula and an iron scent holder — conduct that was legally justified self-defense under Tex. Pen. Code § 9.31, described in Section V.B above.

122. TEA's resulting findings that Plaintiff has "a pattern of violent behavior" and "lacks the fitness to perform the duties... of an educator" rest in material part on the allegation regarding Christian — arising from Cause No. 21-355-441, a charge dismissed outright with no plea of any kind, described in Section IV above — and on the allegation regarding Plaintiff's mother,

unsupported by any objective evidence of bodily injury, described in Section V.B above.

123. TEA's default judgment was entered without any actual adjudication of these allegations and based on fabricated statements and acquisition of falsified statements to forge the adverse outcome. The TEA relied to its own detriment and the plaintiffs on the truthfulness of the defendants, although outright inconsistent with the evidence and the truth. Because Plaintiff never filed an answer, the allegations in TEA's petition were deemed admitted by default, based on certified mailings that were never delivered to him and constructive notice presumed under agency rule rather than actual notice, as described in Section V.D above.

124. This claim is not barred by *Heck v. Humphrey*. As set forth in Section V.D, Texas law treats TEA/SBEC certificate discipline as legally independent of any related criminal disposition, and the specific falsehoods alleged here — including the omission of Plaintiff's self-defense and his status as the person who called police — exceed what any judicial confession underlying the deferred adjudication establishes; a judgment for Plaintiff on this claim does not require, and does not depend on, any finding regarding the validity of the deferred adjudication itself.

125. This claim is timely. Even measured in isolation from the TEA's July 21, 2023 order, the wrongful conduct did not cease on that date: it continued through Defendant Henderson's May 23, 2024 letter declining to correct the record

or take any action regarding the false information MCSO personnel transmitted to the TEA — an independent, later act by the same final policymaker in furtherance of the same course of conduct. Because the wrongful conduct did not cease until May 23, 2024, and this action was filed within two years of that date, this claim is timely under Texas's continuing-tort doctrine. *Twyman v. Twyman,* 855 S.W.2d 619 (Tex. 1993); *First Gen. Realty Corp. v. Md. Cas. Co.*, 981 S.W.2d 495, 501 (Tex. App.—Austin 1998, pet. denied); *Tectonic Realty Inv. Co. v. CNA Lloyd's of Tex. Ins. Co.*, 812 S.W.2d 647, 654 (Tex. App.—Dallas 1991, writ denied).

126. Plaintiff is entitled to a name-clearing hearing regarding the false statements underlying the TEA's default judgment, and to economic, compensatory, and punitive damages under 42 U.S.C. § 1983.

***Part B — Conditions of Confinement and Release***

127. As a pretrial detainee, Plaintiff's right to adequate care and safety during and at the conclusion of confinement arises under the Fourteenth Amendment's Due Process Clause, not the Eighth Amendment. See *Hare v. City of Corinth,* 74 F.3d 633, 639 (5th Cir. 1996) (en banc). A pretrial-custody official violates this right through an episodic act or omission where the official was subjectively aware of a substantial risk of serious harm to the detainee and disregarded that risk. Id. at 643, 650; *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) ("deliberate indifference").

128. Defendant Henderson, as the official responsible for conditions at the county jail, denied Plaintiff his prescribed asthma and HIV medications during his approximately 105-day detention described in Section V.B above, resulting in physical injury including an increase in Plaintiff's HIV viral load and an exacerbation of a latent hepatitis infection.

129. Separately, Defendants Williams and Inmon, aware from their own police report that Plaintiff had no shoes, refused his request to obtain shoes at the time of his arrest. Neither Defendants Williams and Inmon nor any other MCSO personnel provided Plaintiff shoes or an opportunity to obtain them at any point over the following approximately 105 days, including at intake, during the detention itself, or before either of his two releases from custody — notwithstanding that Defendants knew Plaintiff, excluded from his own residence by the protective order, would have no choice but to travel by foot upon release. This sustained failure to correct a known and easily remediable deprivation, over repeated opportunities to do so, reflects that responsible MCSO personnel were subjectively aware of, and disregarded, a substantial and avoidable risk that Plaintiff would suffer physical injury walking barefoot, which he did upon both releases.

130. This claim arose in 2021 and is not independently timely absent a specific, applicable tolling doctrine; Plaintiff pleads it in the alternative and

reserves the right to identify a specific tolling basis upon further factual development.

131. As a direct and proximate result of this denial of medical care and this deliberate indifference to Plaintiff's safety upon release, Plaintiff suffered physical injury and is entitled to compensatory and punitive damages under 42 U.S.C. § 1983.

***Part C — Fabrication of Evidence and Deliberate Framing***

132. "[I]f any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit. Actions taken in contravention of this prohibition necessarily violate due process." *Limone v. Condon,* 372 F.3d 39, 44–45 (1st Cir. 2004). The Fifth Circuit has expressly adopted this principle: a state actor who deliberately fabricates evidence to secure false charges against a person violates the Fourteenth Amendment's Due Process Clause, regardless of whether the charges ever proceed to trial or conviction. *Cole v. Carson,* No. 14-10228 (5th Cir. Sept. 25, 2015) (citing Limone, 372 F.3d at 44–45, 50; *Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003) (en banc); *Boyd v. Driver,* 579 F.3d 513, 514–15 (5th Cir. 2009)).

133. Defendants Williams and Inmon's report characterized Plaintiff as the aggressor notwithstanding: his own documented facial injuries; the complete absence of any comparable facial injury to Christian; Plaintiff's own 911 call

reporting the assault against himself, described in Section V.B above; and, on information and belief, photographs taken at the scene documenting Plaintiff's injuries — the busted lip and cut between the eyes already alleged — that were never disclosed to Plaintiff, made part of the record, or turned over in the course of the proceedings described in Section V.C above, despite plainly having been taken as part of standard evidence-gathering practice for a domestic-violence call.

134. This conduct — constructing and maintaining a charging narrative contradicted by the very evidence in Defendants' possession — constitutes deliberate fabrication of evidence within the meaning of Cole v. Carson and Limone, independent of, and in addition to, the absence-of-probable-cause theory alleged in Count I. By October 2010, and thus well before the events alleged here, it was clearly established that "no reasonable law enforcement officer would have thought it permissible to frame somebody for a crime he or she did not commit." *Cole v. Carso*n (quoting *Limone,* 372 F.3d at 50).

135. This fabrication was not an isolated lapse but part of a broader pattern of arbitrary and capricious conduct — conduct that was random and unpredictable in the sense that it bore no rational relationship to the evidence Defendants actually possessed, and that subjected Plaintiff to consequences no similarly situated person facing the same evidence should have faced. Executive action that is arbitrary in this sense, and that shocks the conscience, independently violates substantive due process. *County of Sacramento v. Lewis,* 523 U.S. 833, 846–47 (1998).

136. As a direct and proximate result of this fabrication and framing, Plaintiff suffered wrongful arrest and prosecution, reputational injury, loss of professional licensure, and emotional distress, entitling him to compensatory and punitive damages under 42 U.S.C. § 1983.

**COUNT VI — STATE LAW: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

137. These allegations are made against Defendants Henderson, Inmon, and Williams individually.

138. Plaintiff incorporates by reference all preceding paragraphs of this Complaint.

139. Defendant Henderson engaged in a continuous course of conduct spanning from the February 2021 arrest through the May 23, 2024 refusal-to-prosecute letter, including endorsing and ratifying the practice described in Section V.A, declining to correct the false information transmitted to the TEA, and ultimately declining to hold Defendants Williams and Inmon accountable notwithstanding MCSO's own knowledge of their conduct.

140. Among the acts comprising this course of conduct, Plaintiff — the documented victim of the underlying assault — was excluded by protective order from his own residence while his brother, the person who struck him, remained free of any such restriction; and when Plaintiff, having no shoes and going to the residence to try to obtain some, was reported by Christian to MCSO, he was arrested a second time before he ever obtained them in a pre-approved and

arranged exchange involving MCSO as the third party indirect arranger. That charge was later dismissed. Separately, Defendants Williams and Inmon's single refusal to let Plaintiff obtain shoes at the time of his arrest was never corrected by MCSO over the following approximately 105 days, leaving Plaintiff barefoot through both of his releases from custody and ultimately forcing him to walk to a shelter and cut his feet, having nowhere else to go. That Christian, also a certified Texas educator, has faced no professional consequence for the conduct Plaintiff alleges he committed, while Plaintiff's own career was effectively ended by a proceeding built on the opposite factual premise, further reflects the carelessness with which Defendants Williams and Inmon treated a misidentification bearing serious professional consequences for both brothers alike. A reasonable factfinder could conclude that excluding an assault victim from his own residence, arresting him for attempting to retrieve basic necessities from it, and leaving him barefoot through more than three months of custody and two releases with no operational reason ever to correct it, is conduct that goes beyond the bounds of decency tolerated in a civilized community.

141. This conduct, considered as a whole, was extreme and outrageous, was intentional or reckless, and proximately caused Plaintiff severe emotional distress.

142. Because this claim is pled as arising from a single, continuous course of conduct rather than any one discrete act in isolation, it is timely under the continuing-tort doctrine on the same basis as Count V, Part A above. *Twyman v.*

*Twyman*, 855 S.W.2d 619 (Tex. 1993); *Adler v. Beverly Hills Hosp.*, 594 S.W.2d 153, 154–56 (Tex. Civ. App.—Dallas 1980, no writ).

143. Plaintiff is entitled to economic, non-economic, and exemplary damages under Texas law.

## COUNT VII — CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS (42 U.S.C. § 1985(3))

144. These allegations are made against Defendants CSPOA, Mack, and Henderson.

145. Plaintiff incorporates by reference all preceding paragraphs of this Complaint, including the statements attributed to Defendant Mack and Defendant Henderson in Section V.A above.

146. To state a claim under 42 U.S.C. § 1985(3), Plaintiff must plead (1) a conspiracy between two or more persons, (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws, (3) an act in furtherance of the conspiracy, and (4) an injury to person or property, or a deprivation of a right or privilege of a citizen. *Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1971). The conspiracy must be motivated by class-based, invidiously discriminatory animus.

147. A conspiracy claim under § 1985(3), like one under § 1983, must satisfy the well-pleaded conspiracy rule: conclusory allegations that an agreement existed, without reference to specific supporting facts, are insufficient to state a

claim. *Priester v. Lowndes Cty.*, 354 F.3d 414, 420 (5th Cir. 2004) ("[a]llegations that are merely conclusory, without reference to specific facts, will not suffice"); *Arsenaux v. Roberts*, 726 F.2d 1022, 1024 (5th Cir. 1982) ("[t]he bald allegation that a conspiracy existed is insufficient"). Plaintiff pleads the specific facts set forth below to satisfy that standard, rather than relying on the bare assertion that Defendants conspired.

***The Agreement***

148. Defendant Henderson's alignment with Defendant Mack and CSPOA's doctrine did not originate with any single event alleged in this Complaint, but is independently evidenced at two distinct points in time, corroborating one another. First, in a 2016 candidate questionnaire predating any event in this case, then-candidate Henderson stated that Mack "not only endorses my campaign for Sheriff, but he is also my friend," and committed to "utilize him as an expert advisor and resource," while separately articulating, in his own words, a doctrine materially indistinguishable from CSPOA's nullification and interposition doctrine, described in Section V.A above. Second, at the February 26–27, 2021 Woodlands training event — after the events giving rise to Plaintiff's arrest — Mack and Henderson spoke at the same event, with Mack articulating the specific doctrine (that sheriffs "have a duty to interpose" against laws they personally deem unconstitutional, that "unjust laws" are "nullities") and Henderson, on the same occasion, articulating the specific operational corollary — the "Rosa Parks effect" practice of using a facially

neutral charge to reach an impermissible end — and personally crediting Mack: "Thank God we've got someone like Sheriff Mack that's helping us."

149. These two data points, five years apart, corroborate rather than merely assert an ongoing relationship and shared operational doctrine between Henderson and Mack: the 2016 statements establish that the alignment predates any conduct alleged in this case, and the 2021 event — at which both men spoke, in person, on the specific practice at issue — confirms that the 2016 alignment had, by that point, matured into a specific, articulated operational practice. MCSO's institutional co-hosting of the February 2021 event is further, non-conclusory evidence that this was an institutional partnership rather than incidental conference attendance.

***Acts in Furtherance***

150. Plaintiff alleges the following acts in furtherance of this agreement, spanning the period during which it is independently evidenced: Defendant Henderson's maintenance and institutional application, through Defendants Williams and Inmon acting within the scope of their employment and under his authority, of the practice described above, resulting in Plaintiff's February 3, 2021 arrest rather than Christian's, described in Section V.B above; Defendant Henderson's public confirmation and reinforcement of that same practice on February 26–27, 2021, alongside Defendant Mack; the continued pursuit of charges against Plaintiff through May 23, 2022, described in Section IV above; the

transmission of the resulting false characterization to the TEA culminating in the July 11, 2023 default judgment, described in Section V.D above; and Defendant Henderson's May 23, 2024 refusal to prosecute or refer Defendants Williams and Inmon notwithstanding MCSO's own knowledge of their conduct, described in Section V.E above. Plaintiff does not allege that Defendants Williams and Inmon were themselves parties to the agreement between CSPOA, Mack, and Henderson; rather, their arrest of Plaintiff is alleged as an act taken by agents of Defendant Henderson, in the course of and consistent with his exercise of the authority and practice described above, sufficient to constitute an act in furtherance of that agreement without requiring that Williams and Inmon personally joined it.

151. Plaintiff pleads this Count subject to the following acknowledged uncertainty: whether animus based on sexual orientation satisfies the class-based, invidiously discriminatory animus requirement of § 1985(3) has not been definitively resolved by the Supreme Court and is treated differently across the circuits. Plaintiff will brief this question further as required and pleads in the alternative that the animus alleged is class-based on grounds this Court determines are cognizable under § 1985(3).

152. As a direct and proximate result of this conspiracy, Plaintiff suffered the injuries alleged throughout this Complaint, entitling him to actual, compensatory, and exemplary damages under 42 U.S.C. §§ 1985(3) and 1988.

## VIII. DECLARATORY RELIEF (28 U.S.C. §§ 2201, 2202)

153. Plaintiff incorporates by reference all preceding paragraphs of this Complaint.

154. An actual and ongoing controversy exists between Plaintiff and Defendant Doolittle, in his official capacity as Henderson's successor, regarding MCSO's obligations under Tex. Pen. Code § 39.03(d) and the Equal Protection Clause going forward.

155. Plaintiff seeks a declaration limited to prospective rights and obligations — specifically, that MCSO may not decline to investigate or refer credible complaints of official oppression under Tex. Pen. Code § 39.03(d) on the basis of the policy described in Section V.A above. Plaintiff does not seek, and this Count should not be construed to seek, any declaration regarding the validity of the underlying criminal dispositions described in Section IV, which are not challenged in this action.

## IX. BASIS FOR PUNITIVE/EXEMPLARY DAMAGES

156. Plaintiff incorporates by reference all preceding paragraphs of this Complaint.

157. Punitive damages are available under 42 U.S.C. § 1983 where a defendant's conduct involves reckless or callous indifference to the federally protected rights of others, or is motivated by evil motive or intent. *Smith v. Wade,* 461 U.S. 30, 56 (1983).

158. Plaintiff alleges that the conduct described throughout this Complaint meets that standard, including, among other things: the misidentification of Plaintiff as the aggressor notwithstanding one-sided physical evidence and Plaintiff's own 911 call; the transmission of that misidentification to the TEA, resulting in a career-ending default judgment obtained without actual notice; the sustained refusal to provide Plaintiff shoes over more than three months of custody and two releases; and Defendant Henderson's refusal, upon actual notice of the underlying facts, to take any corrective action. That Christian — also a certified Texas educator, and, Plaintiff alleges, the person who actually struck him — has faced no comparable professional consequence underscores the recklessness with which Defendants treated a misidentification carrying serious consequences for both brothers alike.

## PRAYER FOR RELIEF

159. WHEREFORE, Plaintiff respectfully requests that this Court:

a. Enter judgment in Plaintiff's favor on Counts I through VII;

b. Grant a trial by jury on all claims so triable;

c. Award actual, compensatory, and exemplary damages in an amount to be determined at trial;

d. Enter the declaratory relief requested in Count VIII;

e. Award reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 1988 and 1985; and

f. Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

/s/ Joseph Aaron Caldarera

Joseph Caldarera, Pro Se
10680 Westbrae Pkwy P 301
Houston, TX
lt.caldarera@gmail.com
(936) 510-3221

# Appendix

Exhibit A - TCOLE memo

Exhibit B - Rand Henderson website 2016

Exhibit C - Policy statements made by Rand Henderson in 2016

# EXHIBIT A

# TEXAS COMMISSION ON LAW ENFORCEMENT

May 26, 2023

Mr. Richard Mack
Constitutional Sheriffs and Peace Officers Association
[redacted]
*via* e-mail: [redacted]

Dear Mr. Mack:

Please find enclosed the Texas Commission on Law Enforcement's (TCOLE) findings and conclusions made in review of the Constitutional Sheriffs and Peace Officers Association (CSPOA) events held in Texas.

As stated, the material presented is best categorized as political discourse and similar content will not merit TCOLE training credit in the future.

Please let me know if you have any questions.

Sincerely,

John P. Beauchamp
Interim Executive Director,
Texas Commission on Law Enforcement

Enc.: As stated.

Cc: Ms. Tonya Benson *via* e-mail: [redacted]

# TEXAS COMMISSION ON LAW ENFORCEMENT

## Memo on Findings and Conclusions

For Attachment to Investigative File

To: Major T.J. Vineyard, Enforcement Division, TCOLE
From: John P. Beauchamp, Interim Executive Director
Subject: Constitutional Sheriffs and Peace Officers Association Events Review
Date: May 25, 2023

## Summary

Based on the Enforcement Division's investigation, the reviewed content will not be eligible for future law enforcement training credit in Texas according to the following:

Under Texas Commission on Law Enforcement (TCOLE) rules, "training" conducted by a training provider will be awarded credit unless it is "not related to a commission license."[1]

The Constitutional Sheriffs and Peace Officers Association (CSPOA) material reviewed is best categorized as political discourse which lacks sufficient instruction or information constituting any meaningful relation to a Texas law enforcement license.

Moving forward, similar CSPOA content does not merit TCOLE training credit.

*Corrective and remedial action.* From the regulatory perspective, TCOLE will review and consider any procedural and policy means needed for improving the state-wide oversight of course instructor and content. This includes improving or new requirements related to course instructors, outlines, and the promotion of courses as TCOLE "approved" or "certified."

The respective training providers were compliant with all applicable standards. Any instances of technical noncompliance were caused by their reliance on longstanding TCOLE policies.

TCOLE can notify Texas training providers of this action. As for the courses already taken, including those occurring prior to formal agency action, credit may be retained for the purpose of continuing education compliance.

## Procedural Background

*2021 Complaint, TCOLE monitors two events.* In 2021, TCOLE received a complaint regarding events put on by CSPOA in Texas.[2] The complaint's specific concerns were with speaker backgrounds and the content of the course entitled "The County Sheriff: America's Last Hope."

In response, two Texas CPSOA events were monitored, including one recorded by audio, by TCOLE Field Service Agents. Brief initial summaries concluded that the events were conducted in accordance with applicable guidelines and training.[3] As with all law enforcement training in Texas, TCOLE training credit was awarded for all attendees as it was reported. No further action was taken by TCOLE.

*2022 public information request, formal investigation opened.* In September 2022, TCOLE received a media request which included a request for CPSOA course curriculum, a required part of a law enforcement training provider's file under TCOLE administrative rules.[4] The request included information for the events monitored by TCOLE in 2021.[5]

After an initial review of the responsive information, it was determined that further and additional inquiry was warranted, and the matter was formally assigned to TCOLE's Enforcement Division.

The scope of the investigation was to determine whether: (1) TCOLE training providers were compliant with TCOLE administrative standards, including maintaining course outlines and instructor qualifications in their training files; and (2) if the events were law enforcement training which merited TCOLE credit.

The investigation included a review of audio recordings, all relevant documents, interviews with attendees, and inspection of training provider training files and records.

**Event content**

*The reviewed material is political discourse.* The CSPOA events offer opinions, anecdotes, and discussion on the separation of powers and exercise of political authority amongst governmental actors and include the following claims:

> "This is a war" in which local, state, and federal agencies have been "weaponized against you" through an "incursion" of "state and federal bureaucrats" that have been "infiltrated" and "placed traitors and saboteurs in local authority." These agents "attack by using federal and state agencies to tyrannize people to advance goals";
>
> Sheriffs "have a duty to interpose on behalf of constituents" against "state and federal bureaucrats" and other "state agents" whose laws, orders, or acts they individually deem as unconstitutional;
>
> Tyranny should be resisted whether from "some other agency in your county, or if it comes from the state, or it comes from the federal government, or it comes from cartels, or it comes from street gangs." "Any government" involved in tyranny should be stopped. When a peace officer refuses an order or law deemed unconstitutional, they are upholding the law; and
>
> Likewise, state executive orders are not law and "can't be enforced" as "you don't swear allegiance to the governor." Finally, whenever the Legislature

is in session "our liberties are in jeopardy" because they are "always creating some law."

Assuming for the sake of evaluation that the material is something other than political discourse, it could be otherwise construed as legal theory.

For example, the events invite Texas law enforcement officers to step into the roles of court and lawmaker because they are "empowered to say what the law is."[6] This is necessary because "some acts of the legislature are not laws" but instead "pretended legislation."[7] Further, "unjust laws" are not to be followed because they are "nullities" and are unlawful to enforce.[8]

Notably, statements by law enforcement attendees indicate that they were under the impression of being taught the authority and duties of Texas Sheriffs and other law enforcement officers under the United States and Texas Constitutions.

However, as presented, there is no meaningful authority cited supporting these proposed legal theories. For instance, there is no authority presented or found for the proposition that "pretended legislation" is a condition precedent to, or legal principle that, lawfully allows the individual nullification of existing laws.

There is also misapplication of the fundamental concept of judicial review, which gives courts the authority to determine the constitutionality of laws.[9] As the United States Supreme Court has said, such a determination is the "gravest and most delicate duty" they are "called on to perform."[10] In similar deference, the Texas Supreme Court *presumes* that statutes and executive agency regulations are constitutional.[11]

Further, attendees are urged to not rely upon duly elected Texas County Attorneys, who are charged under statute with protecting the legal interests of their respective counties.[12]

Based on the foregoing reasons, this material does not merit law enforcement training credit in the future.

Respectfully,

John P. Beauchamp
Interim Executive Director,
Texas Commission on Law Enforcement

---

1 *See* Tex. Occ. Code § 1701.251(c)(2)(the commission may conduct in-service and advanced courses as the commission determines appropriate for officers, jailers, and telecommunicators); 37 Tex. Admin. Code § 215.17(e)(3)(illustrative examples of circumstances not meriting training credit).

2 July 6, 2021 complaint.

3 Upon review, insufficient guidance was provided to TCOLE personnel attending as to the scope and nature of the inquiry.

4 37 Tex. Admin. Code §§ 215.9, .10. (Training Coordinator and Course Instructor Requirements).

5 Also reviewed is audio recorded at April 17-18, 2023 CPSOA events. It is not materially different.

6 *See United States v. City of Jackson, Miss.*, 318 F.2d 1, 17 (5th Cir. 1963)(defiance of the rule of law by a state or city, a governor, or police officer may hamstring the nation).

7 The source of the term itself is used in the colonists' accusation that George III assisted the British Parliament in the continued efforts to tax colonies and subjected the colonists to "a jurisdiction foreign to our constitution." *See* The Declaration of Independence para. 15 (U.S. 1776)("He has combined with others to subject us to a jurisdiction foreign to our constitution, and unacknowledged by our laws; giving his Assent to their Acts of pretended Legislation...For imposing Taxes on us without our Consent...").

8 This is an invocation of Saint Augustine's classic formula, *lex iniusta non est lex* (unjust law is not law) absent the corollary obligation to observe all civil authority. *See City of God*, V. 17.

9 *Gabriel Inv. Grp., Inc. v. Tex. Alcoholic Bev. Comm'n*, 24 F.4th 503, 507 (5th Cir. 2022) citing *McMillan v. Amazon.com, Inc.*, 983 F.3d 194, 202 (5th Cir. 2020) quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

10 *Northwest Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009)(citation omitted).

11 *Patel v. Tex. Dep't of Licensing & Regulation*, 469 S.W.3d 69, 87 (Tex. 2015)(determining whether a law is unconstitutional is a question of law).

12 CSPOA proposes that since attorneys are trained in the "the case law method" "developed at Harvard law school back in the 1880s" they "don't know what the law is" and mistake "pretended legislation" for such.

# EXHIBIT B

The Wayback Machine - https://web.archive.org/web/20160128225011/http://www.randhenderson.org/




- Home
- About Rand
- Endorsements
  - Endorse Rand
- Events
  - Photo Gallery
- Media & Video
- Contact

**The Conroe Professional Firefighters Association endorse Rand Henderson for Montgomery County Sheriff**

Rand Henderson Campaign
PO Box 1678
Conroe, TX 77305

January 12, 2016

The Conroe Professional Firefighters Association is pleased to endorse Rand Henderson for Montgomery County Sheriff. Rand has the experience and training needed to be an effective leader in public service. His contemporary approach to law enforcement is needed in this dynamic atmosphere. We look forward to serving the public along side Sheriff Rand Henderson

Lloyd Sandefer, President
IAFF, Local 2731
P.O. Box 306
Conroe, TX 77305

**The Woodlands Professional Fire Fighters Association, L-3846**
*P.O. Box 130388 The Woodlands, Texas 77393-0388*
www.woodlandsfire.org

**The Woodlands Fire Fighters Endorse Henderson for Sheriff**

Rand Henderson Campaign
PO Box 1678
Conroe, TX 77305

28 November, 2015

The Woodlands Professional Fire Fighters Association is pleased to endorse Rand Henderson for Montgomery County Sheriff. Rand has a proven record in law enforcement in Montgomery County and has shown a commitment to public service through effective interagency cooperation that is valued by all public safety organizations. The firefighters of The Woodlands look forward to serving the public with Sheriff Rand Henderson.

-The Woodlands Professional Fire Fighters



**Montgomery County Law Enforcement Association**
PO Box 8793
The Woodlands, TX 77387-8793

PRESS RELEASE

The Montgomery County Law Enforcement Association, MCLEA, is proud announce our endorsement for Sheriff of Montgomery County, Texas. The MCLEA board evaluated the candidate's endorsement on four important criteria. We believed the Sheriff must have a professional background that has equipped him for this position. He should possess vision and the leadership ability to keep the citizens of Montgomery County safe. Lastly, he should be someone who is a proven leader with in the law enforcement community. Therefore, we endorse Republican Candidate Rand Henderson for Sheriff.





It gives me great pleasure to endorse Rand Henderson for Montgomery County Sheriff! Rand is a true Texan who has served the people with distinction and honor. Yes, Rand Henderson is a law enforcement professional, but more importantly, he is a patriotic American who is dedicated to preserving and defending God-given Liberty.

If the spirit of the Alamo is to survive, then we must have honorable sheriffs who put independence and Texas values first! Rand Henderson is that man and the right man for Montgomery County Sheriff!

Sheriff Richard Mack (RET)
Founder of the Constitutional Sheriffs and Peace Officers Association

# CLICK HERE TO VIEW THE SEPTEMBER 21, 2015 SHERIFF'S ELECTION DEBATE SPONSORED BY THE MONTGOMERY COUNTY TEA PARTY

Email this Share this on LinkedIn Share this on Twitter Share this on Facebook

**Election Countdown:**

March 1, 2016 at 7:00 AM

☑ VOLUNTEER

☑ CONTRIBUTE

☑ VOTING INFO

## Get Updates

Email Address GO

Political Ad Paid for by Rand Henderson Campaign Christina Henderson Treasurer
PO Box 1678, Conroe, TX 77305
Mobile Version | Full Site
Powered by CampaignPartner.com - Political Campaign Websites

# EXHIBIT C

Ads



Pay-Later Option Available
Custom Patch Factory

Home » Rand Henderson

# Rand Henderson

Ads



$0.18 $0.01 $0.01 $0.01

Pay-Later Option Available
Custom Patch Factory





http://www.randhenderson.org/

## Candidate Answer #10 Executive Order

The 10th amendment is often trampled on by the Federal Government. Sheriff Richard Mack is one of the few to fight back and win a state sovereignty case he before the Supreme Court in Mack/Printz v. USA. A local official such as the Sheriff is immune from being compelled to carry out Federal executive orders. He a has the responsibility to his community to protect the people from federal overreach or any act of the Federal Government that violates the Constitution. Sherif not only endorses my campaign for Sheriff, but he is also my friend and I would utilize him as an expert advisor and resource in combating any federal overrea situation faced by Montgomery County. My oath is to preserve, protect, and defend the Constitution and laws of the United States and of this State. I pledge to that oath and protect those who I am sworn to defend regardless of who the enemy may be.

## Candidate Answer #9 Ethics

If I became aware of unethical conduct on the part of a peer, I would ensure it was addressed by the proper arm of government charged with oversight for that particular office or act. As a former internal affairs investigator and supervisor of the unit that conducts all internal investigations of Sheriff's Office misconduc very familiar with these types of complaints and investigations. I am aware that tough decisions need to be made and I am prepared to make those decisions. professional law enforcement officer, I know that lines are always drawn between personal and professional relationships and misconduct on the part of a pee professional. Those that make decisions violating oaths and standards of an office must be held to the standard of public service.

I do believe it should be an element of public service that the reporting of known misconduct is a requirement of the office.

## Candidate Answer #8 Transparency

I would favor all three systems in compliance with freedom of information laws, but the arrest data by name of the deputy has particular bearing on my profess well as the office of Sheriff that I seek.

We at the Sheriff's Office publish all arrests made by all agencies in the county on our website and the inmate data is searchable. We also send out a weekly ne "blotter" that contains a brief account of significant arrests and investigations, which does contain the name of the deputy who was involved or was the lead investigator; however, the deputy's name is removed by most news outlets before the article is run.

Deputies do have a legitimate concern for privacy as they deal with the worst of the worst when carrying out their jobs then they must live within the same soci citizen when not on duty. Their privacy and the personal safety of the deputy and his family should be taken into consideration and balanced with the need for a blanket system that indexes arrests by deputy name.

## Candidate Answer #7 Nullification

Nullification is the principle that the states have a responsibility to not enforce unconstitutional federal laws and prevent federal overreach. I have taken the pos that federal overreach is a concern that must be addressed by local officials by standing in opposition to efforts by the federal government to carry out unconstitutional acts.

As Sheriff, if there is a federal overreach that entails agents of the federal government asking for our local law enforcement assistance in carrying out an unconstitutional act such as the unwarranted seizure of firearms, then I would not assist nor would I stand for this act to occur in our community.

I pledge to use the power of my office to stop an unconstitutional encroachment by the federal government. My solemn oath is to preserve, protect, and defenc constitution. I will carry out that oath and ensure those who work in my office do the same.

My opponent is a career federal agent who is beholden to the federal government and out of touch with the local community. He has taken the position that he not protect our local community from federal overreach. If the federal government were to assert their authority over that of local law enforcement he would "b in a federal police presence" as quoted by the Montgomery County Tea Party allowing them to take control. He states this position on video during the MCTP candidate interviews found on usvotesmart.com. Conversely, the MCTP stated that Henderson "would stand against Feds in overreach situation, such as gun-ç

## Candidate Answer #6 Reinventing Debtors Prison

The purpose of law enforcement writing citations is to protect the driving public. A citation dis-incentivizes reckless and poor driving by attaching a fine as punishment upon conviction. Traffic offenses in Texas are a Misdemeanor C that are punishable with a fine only and not jail time.

A person's failure to appear before the court will likely result in a warrant for the offender's arrest. The scenario most often seen is not a person's failure to pay but a failure to contact the court to make a plea and arrangements for disposition of the citation. Plainly stated, it is a lack of personal responsibility and civic c a member of the motoring public that leads to warrants being issued for their arrest.

My experience with the Justice of the Peace Courts in Montgomery County is that of willingness to work with the alleged traffic offender and work out a plan th acceptable to both parties. Law enforcement has a role in issuing the citation and we "shall" serve all warrants from the court as stated in the warrant itself. I fi offenses listed in the question (speeding, driving without a license, and driving without insurance) to be serious traffic infractions that should be enforced throu issuance of a citation. Speed is a top factor causing crashes. A person driving without a license has not proved they know how to operate a car and are a liabili the driving public.

A person driving without insurance isn't a problem until that person runs into your car and the party who had no fault in the crash will have to pay for the damag think the problem is over stated in the article and I do not see the same issues in Montgomery County.

## Question # 5 Refugee Resettlement

Texas is now the top destination among 50 states for resettlement of people claiming refugee status and the Texas Department of State Health Services repor Texas received over 12000 refugees in 2014. Refugee resettlement is a Billion dollar business.
What is your view of how Texas should respond to the call to accept more refugees?

## Candidate Answer #5 Refugee Resettlement

Governor Abbott took a strong stand against the Federal resettlement of Syrian refugees and was ultimately forced to back down from that stance. Senator Te has proposed legislation that would allow for governors to have input as to refugee resettlement in their states. Immigration is an American ideal upon which tl country was founded; however, illegal immigration has become rampant.

My opposition to resettlement would be against those who have any connection with radical Islamic idealism or extremist Anti-American ideology. The legal immigration, vetting, and resettlement of foreign nationals, to include refugees, is a responsibility of the Federal government. I believe we at the local level shou continue to monitor refugees to ensure they are intent upon becoming Americans versus harboring intent to harm our country. I would advocate for enhanced cooperation with the Federal government and continued monitoring using fusion centers.

The fusion center model is already a working system in which the Sheriff's Office fully participates. We should also continue with local level efforts to force the government to carry out their responsibilities and do their job. With the influx of refugees from countries that sponsor terrorism, we would look to increase mor of any person who may seek to do harm.

# Question # 4 Overcriminalazation

Please review video Overcriminalization in 60 Seconds




What do you think about the relationship between overcriminalization and the growing prison population in Montgomery County ( Sheriff ) of Texas ( Judges ) ( United States ( Congressmen )? What response
should society have to overcriminalization and prison overcrowding?

## Candidate Answer #4 Overcriminalization

enacting laws that have piled up to create the behemoth list of prohibited criminal conduct that we operate in today. We in local law enforcement hold the pow discretionary enforcement, which is the most powerful tool in law enforcement. If law enforcement were required to enforce every law on the books, we would true police state without liberty. Some laws are enforced mostly universally and are well-known criminal offenses like Burglary, Theft, Robbery, Assault, Driving Intoxicated, Murder and Manslaughter, etc. Others such as obscure traffic offenses like "Parked Facing Traffic" or "Walking on Roadway where Sidewalks are P among others are not commonly enforced, but are low level crimes nonetheless.

Having worked for the past 21 years enforcing State and local laws while serving the Montgomery County community in local law enforcement, which is the ro to continue serving in as your Sheriff, I am very familiar with State criminal law. Texas law is composed of 30 codes of criminal conduct and it runs the gamut well-known criminal and traffic laws to the obscure and arcane procedural, civil, and regulatory conduct. The law also states that ignorance of the law is no exc violating it. This leads to the same issue expressed in the video as there are so many laws that no one actually knows how many there are much less know wh

are.

I agree that there are too many laws at every level whether it is local, state, or federal. The legislatures make a living from enacting new legislation, which mea laws every term. What we need is to clean up what we have and eliminate the unnecessary, redundant, and unenforceable laws that are already on the books. Legislators should be evaluated by constituents not only by their productivity in getting their bills passed, but also on how much they did to fix the system as it

The overcriminalization of American society has led to one of the largest prison populations in the world. It is much harder to land a sentence in a Texas state than most think. At the local level, there is any number of sentencing options that judges and juries have at their disposal. First time felony offenders may face probation, fines, alternative sentencing such as counseling or treatment, and deferred sentences. It normally takes numerous trips in front of a judge before pr time becomes the option of choice. I believe our local system does provide the defendant with multiple chances to get on the correct path, but if we in local la enforcement keep arresting him, then the court system will eventually put him away in prison as he will finally be deemed as someone who is not a candidate f

enforcement keep arresting him, then the court system will eventually put him away in prison as he will finally be deemed as someone who is not a candidate rehabilitation.

The majority of laws you will find are not those that will land you in prison. Many of the laws that put offenders in prison are either directly or indirectly related drugs. This is a realm of criminal conduct that has led to the prison expansion and greatly increased incarceration rates as most drug offenses are felonies at state and federal level. This is realm that needs to be most closely focused on and supply side enforcement has led to more incarceration, but not a decline on demand side. I believe that narcotics distribution should be illegal and I support putting every drug dealer in jail. There are many areas that do need decriminal but in my opinion, drug distribution laws are not among them. We in local law enforcement and at the Montgomery County Sheriff's Office specifically, will cont enforce the laws of the State using discretion with a mission of keeping the community we serve a safe place to live, work, socialize, worship, grow a business raise a family.

# Question #3 Filming the Police

With the advent of smartphones and amateur journalist blogging the filming of public interaction of law enforcement with the public has grown exponentially. existence of these digital records can have a significant effect, either positive or negative on investigations and conduct of law enforcement as they go about duties.

One recently proposed bill sought to create a misdemeanor for filming within 25 ft.

Police agencies are responding by drafting new policies that address the legal issues for the public and the members of law enforcement. Recently, the Montg County Sheriff's Dept. and Pct 5 Constables Office attended a NPPA Conference in advance of developing a policy for Montgomery County.

As a Lawmaker, Law enforcer or Law Judge,

What elements must a good policy include and what role should the public play in its development and implementation?

# Candidate Answer #3 Filming the Police

The Montgomery County Sheriff's Office (MCSO) is considering the adoption of a policy that gives guidance to our personnel in instances of the public or medi recording our law enforcement activities. This is a controversial issue in some communities and the MCSO policy is intended to provide direction so as to prev such an issue and to reduce any liability to the agency. The MCSO is 100% video and audio outfitted for all vehicles used to make traffic stops and this has bee case since the State's adoption of legislation for Racial Profiling data in around 2002. We also have had body cameras for several years in specialized units (Motorcycles, K-9, Bicycle Patrol, etc.) and we look to increase the number currently utilized. There are existing policies that regulate and provide guidance for cameras and body cameras so we are looking to add a policy that governs the public capturing video as well.

Our deputies carry out their work duties at all times as if they are being recorded; therefore, being recorded by the public is not as big of a concern for our pers it might be for law enforcement jurisdictions that don't record their public interactions. An element of this policy that is greatly beneficial to the deputies is that provides guidance for the recovery of public video recordings that may have evidentiary value and whether the justification for such is through probably cause, circumstances, when a warrant would be required, etc. There is a legal process for recovery of such data and the guidelines assist the deputy in ensuring the d recovery does not jeopardize loss of the evidence, it maintains the admissibility of the evidence into the court process, and it reduces the liability to the agency public may not interfere with the duties of law enforcement as set forth with legislation governing interference with public duties and the policy helps to define the photographer has done so. The policy reinforces that the photographer may not interfere with an investigation or cross police lines in order to capture the f Furthermore, the policy gives agency justification to the deputy for his actions and if he follows the guidelines as set forth by the agency and his training, then greatly reduces any public outcry against his actions as well as reduces agency liability.

The policy we used as a foundation for the MCSO policy is a model developed by the National Press Photographers Association (NPPA), which is a consortium media outlets. The model policy was developed collaboratively with media outlets in conjunction with law enforcement using guidance from legislation and th courts. Whenever possible, we look to model policies as the foundation for our internal policy governance. We sometimes modify the policy to fit with our spec agency requirements and philosophy. I believe that development of policy that includes stakeholder input leads to the most comprehensive and solid policies. look to the County Attorney for guidance as to prevention of liability upon the agency.

# Question #2 The Nature of Law

During Texas 84th legislative session State Representative Mark Keough introduced HB 3184 a bill seeking to import the civil law process of mediation into cri law. The law applied to some first time misdemeanor and felony offenders. The bill passed though the legislative process but failed to become law on veto by Governor Greg Abbott who stated "Making amends with the victim of a crime does not absolve the criminal of his legal debt to the State."

Do you agree with the Governor? What is the purpose of law from your point of view as a Legislative/Judicial/ Law Enforcement official? Who is it intended to p

What should be the role or effect of private judging companies (such as JudicialArbitration and Mediation Service) in the judicial or incarceration system?

(answer should be based on elected office sought.)

**Candidate Answer #2**

Honorable Mark Keough had a great freshman term in the State House of Representatives and he was able to pass some good legislation. I have heard him ta 3184 several times and he was obviously disappointed that it didn't pass; however, he did defer to Governor Abbott's experience as an attorney and the most re elected Attorney General for the State. This question is directed more at the judiciary than law enforcement, but I think that in certain cases a mediation proce prove valuable. An alternative to incarceration that leads to a decline in recidivism is noteworthy and should be considered for legislation. For first time offend lesser misdemeanor crimes, I think the debt to the State and to the victim could be met through a mediation process as an alternative to incarceration. I would include felony crimes or those offenders with criminal backgrounds as a class of those eligible for this process. This could possibly serve as a mechanism to first time offenders from entering the gateway of the criminal justice system thus giving them an opportunity to prove they are capable of being productive me of society. We need to bear in mind that punishment of offenders provides a deterrent effect upon others and de-incentivizes the risk vs. reward for other crimi Our ultimate goal would be to protect the victim and society from this offender and if both the judge and the victim agree this can be done through the mediati process, then it should be considered as an alternative.

The purpose of law from my perspective as a law enforcement official is that it is a mechanism to keep order within society and keep one person from causin to another. This is done in a balancing act between (1) the rule of law and (2) individual liberty. It is often quoted that we are a country of laws and I agree that be a true statement. We are also a country that founded its laws on religious, specifically Christian, principles of proper behavior when interacting with our fell Our foundation of law is a principal dictating that the vast majority of good Christians will voluntarily follow the law. This occurs because foundational Americ in line with the teaching of the Bible thus Christians see following the law as the right thing to do just as we were taught in our religious upbringing. Unfortunat have seen a societal trend that more people are less religious and thus less inclined to self-govern themselves. From a law enforcement perspective, this is a c challenge as it makes enforcement more necessary and more commonly we see liberty invasive tools and methods used in the law enforcement profession.

The other perspective of law is that our country is based upon the premise of individual liberty. There is a fine line between free self-governance and the rule o that is intended to protect society from its law breakers. I see law enforcement as the fulcrum in that balancing act and it is our duty to protect both the individ liberty and use our state sponsored powers to take liberty from those who do not play by its rules. I feel that society determines where along that balanced lin law enforcement operates. That is the beauty of law enforcement in the United States as a decentralized system composed of 18,000 or so individual agencie sizes and scopes. We the citizens possess control over local law enforcement and we have the ability to petition the government agency responsible for carryi enforcement of the rule of law. A good Sheriff should understand what is most important to his constituency and listen to the needs and concerns of the publi not to trample individual liberties, but also to keep the public safe in their community. As your Sheriff, our agency will strive to be proactive to prevent crimes fr happening, but we will locate, arrest, and jail the offenders that choose to commit crimes in our community.

**Question #1 Civil Asset Forfeiture.**

View Civil Asset Forfeiture in 60 Seconds

Texas Supreme Court Justice Don Willett said "A generation ago in America, asset forfeiture was limited to wresting ill-gotten gains from violent criminals. Tod has a distinctive 'Alice in Wonderland' flavor, victimizing innocent citizens who've done nothing wrong."

*Please reply with your view of the proper application of Civil Asset Forfeiture laws in general in Texas and explain how your view will affect your policy as an elected official.*

**Candidate Answer #1**

The proper application of civil asset forfeiture laws in general in Texas starts with a sound policy that is agreed upon with the law enforcement agencies the county as well as the District Attorney's Office. Our current policy dictates that the District Attorney is consulted prior to the asset seizure to determi legal as well as ethical standards are met. We in law enforcement operate under approved asset forfeiture legislation and we have a duty to create benevolent policies and practices that make application just and fair. As with any law that allows for a great deal of discretion, there is ample opportunit misapplication as well as abuse. The purpose of civil asset forfeiture is to remove the ill-gotten property from those who have used their criminal activity attain such property. The theory is that if law enforcement can separate the fruits of the crime from the criminals and use that property or currency in an enhanced effort to combat further criminal activity, that there will be a more productive and better financed effort in thwarting future criminal activity.

This theory has been abused over the years and some agencies use their civil asset forfeiture accounts to buy "cop toys" and to finance purchase of improper or inappropriate items. Some agencies set no or low policy thresholds that bring criticism and allegations of unfairness. It is my opinion that a seizures should be specifically directed at those who are making money from crime, for example, the drug dealer and not the drug user or the illegal gam establishment owner not the gambler. The proper application of asset forfeiture would be to remove the asset from the criminal after establishing a tie indicating that the asset was gotten from the profits of crime. The drug user may be in possession of a felony amount of drugs while driving a nice car, b there is no tie to that car having been purchased using drug money, then there is no call for a seizure. This would require scrutiny or even eliminate the seizure of small or inappropriate items as described in the accompanying article that listed cell phones and DVD players or other small ticket items as seized assets. There should be limits set for cash seizures as well. A person traveling with $2000 cash should not be subject to asset forfeiture for mere possession of the cash. A person with $2000 cash who also had drugs in a felony amount packaged for sale and when asked where the money came fr answered by saying, "I don't know; that's not mine" would be subject to seizure. The aforementioned scenario is a very common one found in traffic stop

I believe that the limits should be set to focus solely on felony crimes and not misdemeanors. It is also an important ethical element to ensure that the a is not granted to the government until the criminal case is disposed. Some agencies will assume ownership of a seized item although the crime for whic the defendant has been charged has not been disposed. I think it is imperative, which is a current practice in Montgomery County, that the criminal is convicted of his crime before the asset is awarded to the government.

The spending of asset forfeiture funds by law enforcement is set out in legislation as well. Proper use of the funds would be to enhance, not fund or supplant, the purchase of law enforcement equipment. I would like to see the legislation amended to allow for a local law enforcement agency to use th funds for law enforcement salaries or for overtime projects. This element of the code is limited to the District Attorney's Office; therefore, local law enforcement looks to the DA for overtime money. I feel that as Sheriff, I should be able to use the money to fund overtime projects that are specifically u to combat identified criminal activity.

The asset forfeiture program in Texas is far from perfect and it has been abused by some; however, it remains a viable tool in combating crime and uses non-tax payer revenue stream to do so. I feel that if managed properly it is an asset that can be a "game changer" in the law enforcement battle against t criminal element. The Koch produced video, which was also an accompaniment to this question, ended by asking if it was time to stop law enforcement from keeping the assets they seize in order to stop abuses of the law. The first distinction is that law enforcement seizes the assets, but there is a civil o court process that decides if the asset is forfeited and actually awarded to the government. It is true that removing the financial incentive from law enforcement agencies would slow down and even stop asset seizure efforts in some jurisdictions. If the legislation was to change and law enforcement agencies were no longer allowed to keep the assets they seize, we at the Sheriff's Office would continue to provide law enforcement services at a high le There are assets we would not have and our abilities to combat crime would be more restricted. We would have a much higher reliance on tax payer bas funding for programs that are expensive and that the public would agree are necessary for a large and modern law enforcement agency. I believe that th requirements found in the legislation should be more in line with the policy described previously and that Police Chiefs, Sheriffs, and District Attorneys should be audited regarding their acquisition and use of the fund. If a drug dealer can fund a necessary law enforcement purchase or program, instead o being funded by a tax payer, I think that is a good application and something we need to take full advantage. If the agency head uses the fund in a mann not consistent with the law or the values of his constituency, then he should be held accountable by the law or through the political process. As your She would welcome public transparency and scrutiny of the account to include how the money was attained as well as how it was spent.

Ads





[redacted]

Customize Your Patch Today. Largest Supplier of Patches In USA. Nobody Can Beat Our Price.

CustomPatchFactory.com

Open

MCTXonline 2026.